UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WHITNEY HODGES, as Personal
Representative for the Estate of Honestie
Hodges,

     Plaintiff,

v.

CITY OF GRAND RAPIDS, et al.,

     Defendants.

_____/

Case No. 1:23-cv-1230

Hon. Hala Y. Jarbou

## <u>OPINION</u>

This is a civil rights action under 42 U.S.C. § 1983 and state law against the City of Grand Rapids (the "City"), and Grand Rapids Police Officers Spencer Sellner, Anthony Barberino, and Jeffrey Dionne.[1]   Plaintiff Whitney Hodges asserts that Defendants violated the constitutional rights of her daughter, Honestie Hodges.   Before the Court is Defendants' motion to dismiss the complaint (ECF No. 13).   For the reasons herein, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

### A. Summary

In December 2017, when Honestie was eleven years old, she walked out the back door of her home with a family friend, Aisha Rose, and encountered multiple police officers with their guns drawn on her and Rose.   The officers were looking for an adult suspect who did not look like Rose or Honestie.   Rose and Honestie put their hands up and complied with the officers' directions.

---

[1] The parties stipulated to dismiss former Chief of the Grand Rapids Police Department, David Rahinsky.

The officers placed Honestie in handcuffs with her hands behind her back, patted her down, and then put her into a police cruiser. The claims in this case stem from these events. Tragically, Honestie died in 2020 due to complications from COVID-19. Plaintiff brings this action on behalf of Honestie's estate. Plaintiff sues several of the officers involved in the incident as well as their employer, the City.

### B. Allegations

The following facts are taken from the complaint (ECF No. 1) and from videos taken by body cameras ostensibly worn by Sergeant Thomas Bush, Officer Barberino, Officer Dionne, and Officer Sellner (ECF No. 17).[2]  The Court construes the facts and draws all reasonable inferences in favor of Plaintiff.

On the evening of December 6, 2017, Grand Rapids police were informed that an adult woman had stabbed another individual. (Compl. ¶ 78.) The suspect was an adult Caucasian female with black hair pulled into a bun and wearing a black coat. (*Id.* ¶ 79.) Dispatch informed officers that she had fled the location of the stabbing while still in possession of the knife. (Barberino Body Cam 27:50.) Officers gathered near Honestie's house, apparently believing that the suspect was in the area.

Around that time, Rose and Honestie decided to walk to a nearby store. Apparently unaware of the police presence in the area, they exited Honestie's house through her back door and started walking down the porch steps into the backyard. Plaintiff watched as Honestie left. (Compl. ¶¶ 49, 51.) When officers saw Rose and Honestie, they told them to put their hands up. Bloom, who was in the yard adjacent to Honestie's backyard, pointed his firearm at them. (Bloom Bodycam 25:56.) Sellner also drew his firearm on them. (Compl. ¶ 52.) At the time, there were

---

[2] For reasons discussed below, the Court can consider the video evidence at this stage.

officers located on both sides of Honestie's backyard and at the far end of that yard opposite the house.  Rose and Honestie stopped and put their hands up.  (Bloom Bodycam 27:13)  Honestie told the officers, "I'm only eleven."  (*Id.* 27:17.)  Indeed, Honestie was not an adult and had dark brown skin; she clearly did not match the description of the suspect.  Plaintiff was also on the front porch and she put her hands up.  According to the video, Plaintiff has light brown skin and black hair that she was wearing in a bun.  (*See* Sellner Bodycam 34:03.)  She was wearing a black, short-sleeved top.  Bloom noted, "There isn't a white female?" though it is not clear whether he could see Plaintiff from his vantage point in the adjacent yard.  (Bloom Bodycam 27:58.)

According to his body camera, Barberino was nearby on foot.  Dispatch reported that  more officers were needed by Honestie's location, so Barberino walked around a neighboring house toward the side of Honestie's backyard.  Upon seeing Rose, Honestie, and/or Plaintiff standing with their hands up, Barberino told the other officers, "I got cuffs, I'll come hook 'em." (Barberino Bodycam 28:35.)  Barberino spent a minute or so trying to figure out where to approach Rose, Honestie, and Plaintiff because the yard was surrounded by a low fence.  (*Id.* 29:52.)  Meanwhile, another officer directed Rose to walk backwards away from the house as he kept his firearm pointed at her.  (Bloom Bodycam 29:36.)  She complied with his directions.  The officer then led Rose away from the yard into an alley behind it.  (*Id.* 29:48.)  Bloom told Rose that she was being detained; she was not under arrest.  (*Id.* 29:52.)

Honestie was still standing on the steps near her mother; both of them still had their hands raised.  (*Id.*)  Barberino asked another officer, "Is this her?" (*Id.* 30:03.)  "No," the officer replied. (*Id.* 30:04.)  Meanwhile, Sergeant Bush reported to dispatch that the officers had identified "three subjects" who were "compliant," and that the officers were "working on putting them into custody."  (Bush Bodycam 30:40.)

3

Some officers kept their firearms pointed in the direction of Honestie and her mother, who were standing still with their hands raised.  (Barberino Bodycam 30:15.)  Sellner told Honestie to step down off the steps.  (*Id.* 30:22; Compl. ¶ 56.)  She did so.  He commanded her to walk backwards toward him, and she did.  Barberino then put Honestie in handcuffs with her hands behind her back.  (*Id.* 30:48; Compl. ¶ 60.)  Honestie became upset and started screaming, "No!"  Barberino told her, "You're fine.  You're not going to jail or anything. Quit crying!"  (*Id.* 30:57.)  He pulled her toward a cruiser parked behind the garage and then turned back around to face Plaintiff with his firearm pointed at Plaintiff's legs.  (*Id.* 31:17.)

A different officer led Honestie toward a police vehicle as Bush told her, "You're OK.  You're not in any trouble.  Just relax."  (Bush Bodycam 31:10-31:23.)  Dionne patted Honestie down, searched her coat, and then guided her to the back seat of a police cruiser.  (Dionne Bodycam 31:30-32:50; Compl. ¶ 71.) Dionne asked Honestie if she "knew somebody by the last name of Manning" and Honestie responded that she did not.  (*Id.* 31:43.)  Dionne initially had Honestie sit in the back of the car with her cuffs on but then he had her stand up again after she started crying.  He took the handcuffs off her and then directed her to sit in the back seat of the car again.  (*Id.* 33:14.)  She did so and then Dionne closed the door.  (*Id.* 33:21.)  Shortly thereafter, an officer asked Dionne, "Is anybody here?"  Dionne responded, "I don't know.  I just came up and they were already pulling them out so I don't know."  (*Id.* 34:07.)

Meanwhile, other officers, including Barberino, repeated a similar process with Plaintiff, having her walk toward them with her hands up as they pointed firearms at her, and then telling her to turn around to let them put her in handcuffs behind her back.  (Barberino Bodycam 31:50-32:22.)  She did as she was told.  After escorting Plaintiff to a different police cruiser, they asked her some questions.  It is not clear how long Honestie remained in the police vehicle.

### C. Procedural History

Plaintiff filed her complaint in November 2023, asserting ten different counts of violations of federal and state law.  Defendants move to dismiss the complaint for failure to state a claim.  As part of their motion, Defendants raise the defenses of qualified immunity to the federal claims and governmental immunity to the claims under state law.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id*. (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Qualified Immunity

Defendants argue they are entitled to qualified immunity.  An officer is entitled to qualified immunity and is shielded from damages and the burdens of suit "if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have

known." *Smith v. City of Troy*, 874 F.3d 938, 943 (6th Cir. 2017) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Determining an officer's "entitlement to qualified immunity" thus "involves a two-step inquiry."  *Smith*, 874 F.3d at 944.  First, the Court must determine whether the facts alleged, judged in a light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right.  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "If no constitutional right would have been violated on the facts alleged, the inquiry stops at that point and the officer is entitled to qualified immunity."  *Id.*

Second, "[i]f a violation can be made out . . . the court must determine whether the right at stake was clearly established."  *Id.*  "In making this determination, the court must rely on decisions from the United States Supreme Court, the Sixth Circuit Court of Appeals, or finally, the decision of other circuit courts."  *Id.* (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993)).  "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018).  "Although 'a case directly on point' is not necessary to overcome qualified immunity, 'existing precedent must have placed the . . . constitutional question beyond debate.'"  *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Once the defense is raised, the "plaintiff bears the burden of overcoming qualified immunity."  *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).  That burden includes "pointing to legal authority that clearly shows that the constitutional question . . . should be resolved in [the plaintiff's] favor."  *Linden*, 75 F.4th at 604.

## III. ANALYSIS

### A. Evidence

At the outset, the Court must determine what documents or evidence it will consider.  In support of its motion, Defendant relies upon bodycam video of the incident as well as a "CAD Event Report"[3] (ECF No. 14-1) and a police report (ECF No. 14-3).  When considering a motion to dismiss under Rule 12(b)(6), the Court's decision "rests primarily upon the allegations of the complaint[.]" *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008).  However, the Court can also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion . . .  so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).  The CAD Event Report and police report do not fall under any of these exceptions.  Defendants contend that these documents are public records, but they provide no support for that assertion.  And even if these documents are public, the Court is not obligated to consider evidence that is "subject to reasonable dispute" or that "captures only part of the incident and would provide a distorted view of the events at issue[.]"  *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (quotation marks omitted).  The foregoing documents are potentially subject to dispute and might provide a distorted view of the events at issue.  Among other things, they appear to be hearsay and as such, they are not inherently reliable.  Also, it is not clear which Defendants were aware of the facts asserted in those documents at the time of Honestie's detention.  Accordingly, the Court will not consider these documents.

---

[3] The CAD Event Report appears to be a summary of events and their corresponding times recorded by individuals at the police department.

7

The Court can also consider video evidence where the complaint relies on facts that "could only be known . . . by watching the video[.]" *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022).  In such cases, "it makes little sense to waste time and effort by ignoring the video['s] contents." *Id*.  However, that use is limited; "[i]f there is a factual dispute between parties, [the Court] can only rely on the video[] over the complaint to the degree the video[] [is] clear and 'blatantly contradict[s]' or 'utterly discredit[s]' the plaintiff's version of events." *Id*.  (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court's summary of the facts and evidence in Section I above conforms with these rules.  The Court can consider the videos because they depict conduct and events that could only be known by watching them.  It makes little sense to ignore their contents at this stage.  Regardless, the Court accepts the complaint as true unless the videos blatantly contradict it.

### B. Counts I-III: Fourth Amendment

In Counts I-III of her complaint, Plaintiff claims that Officers Sellner, Barberino, and Dionne seized and detained Honestie without probable cause or reasonable suspicion that she had committed a crime, and without any other reasonable basis, and used excessive force in doing so, all in violation of her Fourth Amendment rights.

#### 1. Official Capacity Claims

Plaintiff sues Defendants in their official capacities as well as their individual capacities. Defendants argue that the official capacity claims are duplicative of Plaintiff's claims against the City.  "An official capacity claim filed against a public employee generally represents another way of pleading an action against the public entity that agent represents." *Curtis v. Breathitt Cnty. Fiscal Ct.*, 756 F. App'x 519, 525 (6th Cir. 2018).  "'As long as the government entity receives notice and an opportunity to respond,' courts treat an official capacity suit as a suit against the entity." *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  The Court of Appeals has

approved the dismissal of official capacity claims against public employees where the public entity employer is also a defendant.  *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) ("Where the entity is named as a defendant, an official-capacity claim is redundant."); *accord J.H. v. Williamson Cnty.*, 951 F.3d 709, 723 n.4 (6th Cir. 2020) ("The district court correctly dismissed the[] official capacity claims as superfluous of the claim against the county.").  The Court will do the same here.

Plaintiff argues that, if the Court dismisses the official capacity claims at this stage and later finds that an individual officer is liable, then the City could refuse to satisfy a judgment against the individual officer because the official capacity claims were dismissed.  Plaintiff is correct, but the result would be the same even if the Court kept the official capacity claims in the case.  The City is not liable for damages under § 1983 simply because one of its employees has violated the Constitution.  Rather, the City is liable only if Plaintiff can also show that Honestie's constitutional injury resulted from a "policy or custom" of the City.  *Kentucky v. Graham*, 473 U.S. at 166 (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Thus, even if Plaintiff maintained her official capacity claims against the individual officers, victory against the officers alone would not entitle Plaintiff to recover damages from the City.  To obtain damages from the City, Plaintiff would have to make the additional showing required for her claim against the City itself.  *See id.* ("[I]n an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law.").  Put another way, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive or declaratory relief."  *Id.* at 167 n.14.  And that is what Plaintiff has done here.  She sued the City, which is the local government entity that employed the officer-defendants.  Consequently, there is no need for her to assert

official capacity claims against those officers.  The Court will therefore dismiss the official capacity claims as duplicative.

### 2. Wrongful Seizure

Plaintiff claims that Defendants detained, searched, and seized Honestie without probable cause or reasonable suspicion.  "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .'"  *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (quoting U.S. Const. amend. IV).  "[I]t is well established that a warrantless search and seizure is unreasonable absent probable cause and exigent circumstances."  *Id.*  Even a brief and limited detention for investigatory purposes is "a seizure that is subject to Fourth Amendment scrutiny."  *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001).  Such a detention requires "'reasonable suspicion' that criminal activity may be afoot[.]"  *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Terry v. Ohio*, 392 U.S. 1, 30-31 (1986)).  And such a detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983).

> When the nature of a seizure exceeds the bounds of a permissive investigatory stop, the detention may become an arrest that must be supported by probable cause.  Yet, there is no litmus test for determining when the line is crossed. We consider such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigatory stop is reasonably related to the basis for the original intrusion.

*Dorsey*, 517 F.3d at 398-99.

Viewing the allegations and evidence in a light favorable to Plaintiff, Defendants detained Honestie at gunpoint, handcuffed her, and then put her into a police cruiser without probable cause or reasonable suspicion to suspect that she or anyone else in her home was involved in criminal activity.  Defendants contend that they were looking for a stabbing suspect whom they were told

might be located at Honestie's address.  Nothing in the complaint, however, provides the reason for why Defendants were at or near Plaintiff's home when Honestie walked out her back door.  To the contrary, Plaintiff alleges that Defendants were purportedly looking for a suspect who had stabbed another individual at a different location.  (Compl ¶ 78.)  Plaintiff also alleges that incident was "unrelated to Honestie or any of the occupants of [her] house."  (*Id.* ¶ 2.)

The video footage does not blatantly contradict these assertions.  In fact, it does not provide the justification for detaining anyone at Honestie's home, let alone doing so through the use of firearms, handcuffs, and detention in a police cruiser.  Before Honestie was detained, one officer in the videos mentioned a suspect who was on foot (Bush Bodycam 27:11), but there are no additional details tying that suspect to Honestie or to anyone in Honestie's house.  In addition, *after* detaining Honestie, Sergeant Bush told Plaintiff that the officers were looking for someone "at [Plaintiff's] house or coming to the house."  (*Id.* 33:17.)  That statement, however, is too vague to supply reasonable suspicion, probable cause, or any other justification for detaining Honestie.  Moreover, that after-the-fact justification does not utterly discredit Plaintiff's version of the events; thus, the Court need not accept it as true when assessing whether the complaint states a viable claim.[4]  In short, Plaintiff has stated a plausible claim that Defendants violated Honestie's right to be free from an arrest or detention that was not supported by probable cause, reasonable suspicion, or exigent circumstances.

Defendants assert that they are entitled to qualified immunity.  The Court has already concluded that Plaintiff states a viable constitutional claim.  At the next step of the qualified immunity analysis, the Court must determine whether Plaintiff has shown that the right at issue

---

[4] The CAD Event Report refers to a stabbing suspect who "may be enroute" to Plaintiff's address on foot (ECF No. 14-1, PageID.116), but the Court declines to consider that report for the reasons discussed above.

was clearly established.  Plaintiff has satisfied her burden.  It is clearly established that Defendants could not detain Honestie without cause for doing so.  In other words, any reasonable officer in Defendants' respective positions would have known that they could not detain Honestie (through firearms, handcuffs, or otherwise) simply because they were looking for an adult suspect involved in a stabbing incident that occurred at another location somewhere else in the city.  Thus, on the record properly before the Court at this stage of the case, Defendants are not entitled to qualified immunity for this claim.

### 3. Excessive Force

"A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force." *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022)).  In determining whether an officer used excessive force, the Court asks whether the officer's use of force was "objectively reasonable in light of the facts and circumstances confronting [him] without regards to [his] underlying intent or motivations." *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (internal quotation marks omitted).

The Court must evaluate each incident in its own context, considering factors such as "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  This test evaluates the "reasonableness of the moment of the use of force as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight." *Kent*, 810 F.3d at 390 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 320 (6th Cir. 2015) (internal quotation marks omitted)).  The Court must account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 396-97.  When "a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'" *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Smith*, 874 F.3d at 944).  "The ultimate question, however, is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Kent*, 810 F.3d at 390 (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

Here, the parties focus on Defendants' use of firearms to detain Honestie and their use of handcuffs to restrain her.

### (a) Use of Firearms

Brandishing a firearm to effect a detention can be an excessive use of force.  As a general matter, "a police officer may approach a suspect with a weapon drawn during a [traffic] stop when the officer reasonably fears for his safety." *Wright*, 962 F.3d at 865.  But "[a]n officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force." *Id.* at 866 (quoting *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (collecting cases)).

Applying the relevant factors here indicates that Defendants' use of firearms was excessive.

*Severity of the crime.*  Plaintiff alleges that a stabbing had been committed, which is a serious crime.  Construing the facts in Plaintiff's favor, however, there was no reason for the officers to believe that Honestie or anyone in her home were involved in that offense.

*Threat.*  Neither the complaint nor the videos provide any justification for deeming Honestie (or anyone near her) to be a threat.  Honestie was a young girl who complied with the officers' commands at all times.  Both Rose, who was standing in front of Honestie, and Plaintiff, who was standing behind Honestie, appear to have done the same.  Even if Plaintiff shared some

13

physical traits as the suspect (i.e., adult with black hair in a bun, lighter skin), more information would have been necessary to give Defendants reason for believing that Plaintiff was the suspect in a stabbing that had occurred somewhere else in the city.

*Resisting arrest*.   Neither Honestie nor anyone else around her was fleeing or resisting arrest when the officers approached and detained them.  Thus, this factor also weighs in Plaintiff's favor.

In sum, all the relevant factors weigh in Plaintiff's favor at this stage.   And when considering the totality of the circumstances, Plaintiff has pleaded sufficient facts to state a claim that Defendants used excessive force when drawing firearms on Honestie.

Turning to the qualified immunity analysis, the rights at issue were clearly established.  In 2017, "it was clearly established . . . that brandishing a firearm without a justifiable fear that [the plaintiff] was fleeing or dangerous was unreasonable and constituted excessive force."  *Wright*, 962 F.3d at 870 (finding this principle was clearly established as of 2016, citing *Binay*, 601 F.3d at 650 and other case law predating 2017).  Construing the available facts in Plaintiff's favor, those are the circumstances here.

Defendants argue that this principle does not apply to Officer Sellner because he did not point a firearm directly at Honestie; instead, he pointed it at the ground.  In the complaint, however, Plaintiff alleges that Sellner pointed his firearm "toward" her.  (Compl. ¶¶ 136-37.)  The video evidence does not "blatantly contradict" this assertion.  In fact, for much of the video, it is not clear precisely where Sellner is pointing his weapon.  And contrary to Defendants' assertion, on at least one occasion, he appears to point it at Honestie's feet.  (Barberino Bodycam 30:39 (showing red laser light at Honestie's feet).)  Thus, the Court is not persuaded that Sellner's conduct is not covered by the rule in *Wright*.

**(b) Use of Handcuffs**

It is less clear to the Court that the ordinary use of handcuffs (without overtight handcuffing, which is not at issue here) can give rise to an *excessive force* claim under the Fourth Amendment, as opposed to a claim of wrongful or unreasonable seizure.  A wrongful seizure claim considers the reason for the detention, if any, and the level of intrusion involved in the detention (including the use of restraints like handcuffs and the duration of those restraints).  *See Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005) (assessing whether handcuffing plaintiffs and detaining them in the back of a police car was "excessively intrusive" and exceeded the bounds of a permissible investigative stop).  But one case implies that an *excessive force* claim stemming from the use of handcuffs arises only when the handcuffs are applied too tightly.  *See Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001) ("[W]hen there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment.").

Plaintiff cites two cases for her contention that the ordinary use of handcuffs can give rise to an excessive force claim, but those cases do not support her argument.   In *Brown v. Lewis*, 779 F.3d 401 (6th Cir. 2015), police officers stopped the plaintiff, "ordered her out of her car at gunpoint, threw her to the ground, handcuffed her, and detained her in handcuffs for approximately ten minutes."  *Id.* at 407.  The plaintiff first claimed that her seizure "was wrongful because the stop was more intrusive than was warranted by the degree of reasonable suspicion held by the officers."  *Id.* at 412.  Next, she claimed that "the officers' use of force during the stop was excessive."  *Id.*  The Court of Appeals discussed these two claims separately. The court discussed the use of handcuffs when determining whether the scope of the seizure was reasonable.  *Id.* at 415.  But the court focused on the use of force involved in throwing her to the ground when

15

determining whether the officers used excessive force.  *Id.* at 419.  The court did not suggest that the application of handcuffs was an additional use of force that supported an excessive force claim.

In *Al-Lamadani v. Lang*, 624 F. App'x 405 (6th Cir. 2015), the defendant handcuffed the plaintiff too tightly while investigating the plaintiff's suspected violation of a personal protection order.  *Id.* at 407-08.  The plaintiff sued the officer, claiming "excessive force and unlawful seizure[.]"  *Id.* at 408.  As in *Brown*, the Court of Appeals discussed the wrongful seizure claim separately from the excessive force claim.  The court discussed the use of handcuffs when considering whether the seizure was reasonable.  *Id.* at 412.  And when discussing the excessive force claim, the court focused solely on whether the defendant should have responded to the plaintiff's complaint that the cuffs were too tight.  *Id.* at 414-15.  Thus, the court did not suggest that the application of handcuffs alone could be an excessive use of force.

On the other hand, in *Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010), the Court of Appeals determined that the alleged use of handcuffs and guns to detain the plaintiffs during the execution of a search warrant was an excessive use of force under the circumstances.  *Binay*, 601 F.3d at 650.  The court's analysis did not separate the use of guns from the use of handcuffs, suggesting that the use of handcuffs contributed to the excessive degree of force.  *Id.*  In addition, the Supreme Court has described the application of handcuffs as a "use of force" that involves a "separate intrusion in addition to detention."  *Muehler v. Mena*, 544 U.S. 93, 99 (2005).  And finally, the Sixth Circuit's opinion suggesting that handcuffing alone is not an excessive use of force expressly applies only where there is a "lawful arrest."  *Neague*, 258 F.3d at 508.  That case does not apply here because Plaintiff's allegations plausibly suggest that there was no lawful arrest or detention.  Thus, at present, the Court is not persuaded that the ordinary application of handcuffs can never give rise to an excessive force claim.

Turning to Defendants' qualified immunity defense, the Court finds it clearly established that an officer could not use handcuffs or any other force to restrain an individual without any discernable grounds for doing so.  Under the facts alleged and depicted in the videos, officers had no reason to suspect Honestie or anyone in her home of criminal conduct.  Also, she complied with officers' commands, she kept her hands raised, and she posed no apparent threat.  Any use of force on Honestie in these circumstances was objectively unreasonable.  *See Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) ("The general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest.").  Based on the facts alleged in the complaint that are not blatantly contradicted by the video, even in the absence of identifiable precedent addressing similar circumstances, this is an "'obvious case' . . . where the unlawfulness of [Defendants'] conduct is sufficiently clear[.]" *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).  Accordingly, the Court will not dismiss Plaintiff's Fourth Amendment claims, and at this stage, the Court will not grant Defendants qualified immunity for those claims.[5]

### C. Counts IV-V: Municipal Liability

In Counts IV and V, Plaintiff claims that the City is liable for the alleged violations of Honestie's constitutional rights.  As indicated above, a municipality like the City "may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2013) (quoting *Monell*, 436 U.S. at 691).  "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'"  *Wright*, 962 F.3d at 879-80 (quoting *Alman*

---

[5] Defendants are free to assert qualified immunity as a defense after discovery, when the facts are more fully developed.

17

*v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).  "A plaintiff does this by showing that the municipality

had a 'policy or custom' that caused the violation of his rights."  *Id*. at 880 (quoting *Monell*, 436

U.S. at 694).

Plaintiff can demonstrate that the City had such a policy or custom in one of several ways.

She may show:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an
> official with final decision making authority ratified illegal actions; (3) the
> existence of a policy of inadequate training or supervision; or (4) the existence of a
> custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

### 1. Inadequate Training / Supervision

Plaintiff claims that the City had a custom or policy of failing to train and supervise officers

with respect to their interactions with children.  First, Defendants argue that Plaintiff does not state

a claim against the City because there is no underlying constitutional violation.  That argument is

unavailing because the Court has determined that Plaintiff states viable Fourth Amendment claims.

Next, Defendants argue that Plaintiff fails to plead sufficient facts to state a claim against

the City based on a policy of inadequate training or supervision.

> To succeed on a failure to train or supervise claim, the plaintiff must prove the
> following: (1) the training or supervision was inadequate for the tasks performed;
> (2) the inadequacy was the result of the municipality's deliberate indifference; and
> (3) the inadequacy was closely related to or actually caused the injury.

*Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis v. Cleveland*

*Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).  In other words, "the inadequacy of police

training may serve as the basis for § 1983 liability only where the failure to train amounts to

deliberate indifference to the rights of persons with whom the police came into contact."  *Id.* at

287 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

"There are 'at least two situations in which inadequate training [or supervision] could be found to be the result of deliberate indifference.'" *Id.* (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)).  First, Plaintiff can show deliberate indifference by showing a failure to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Cherrington*, 344 F.3d at 646).  Under this approach, Plaintiff must allege facts from which to infer that the City's awareness of "*prior* instances of unconstitutional conduct" put it on notice that its training or supervision was "deficient and likely to cause injury[.]" *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (emphasis added)).

Second, Plaintiff can show that the City was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).  In other words, the "need for more or different training" may be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the City's failure amounts to deliberate indifference. *Id.* (quoting *Harris*, 489 U.S. at 390).  Under this approach, notice of a pattern of unconstitutional conduct is not necessary; deliberate indifference may be present because the "risk of the constitutional violation is so obvious or foreseeable" that the City should have prepared its officers for it. *Id.*

Even when drawing all reasonable inferences in her favor, Plaintiffs' allegations do not satisfy either approach.  Plaintiff alleges that the City "did not provide its employees with adequate training regarding interaction with children/youth citizens" and that the city "had no policy for its officers to follow when interacting with children/youth citizens."  (Compl. ¶¶ 103-04.)  Plaintiff further alleges that the City adopted a policy in 2018 that "calls for using the least restrictive option when interacting with children and youth citizens."  (*Id.* ¶ 106.)

Notably, Plaintiff does not allege a pattern of prior unconstitutional conduct by the City's employees, as required by the first approach. Plaintiff identifies only one similar incident occurring before hers: in March 2017, City police officers allegedly "held several African American boys at gunpoint as the boys were walking home after playing basketball[.]" (Compl. ¶ 14.) She alleges that "[n]one of these children were armed, dangerous, or had committed any semblance of a crime." (*Id.* ¶ 15.) One prior incident, however, is not enough to infer a pattern of unconstitutional conduct. *Cf. D'Ambrosio*, 747 F.3d at 388 (holding that three prior instances of unconstitutional conduct were insufficient to establish a pattern that would show deliberate indifference by the municipality); *accord Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1039 n.1 (6th Cir. 2024) (holding that one prior instance of unconstitutional conduct did not establish a pattern that would suffice to state a municipal liability claim).

Plaintiff also points to at least one other incident occurring *after* the one involving Honestie. She alleges that, in August 2018, the City's police officers detained two eleven-year-old boys and a teenager at gunpoint, even though none of the boys were armed or had committed "any semblance" of a crime. (Compl. ¶¶ 14, 15.) An incident occurring *after* Honestie's injury does not tend to show that the City was deliberately indifferent *at the time of* Honestie's injury. Moreover, the City's alleged adoption of a policy calling for the "least restrictive option" when interacting with children and youth does not tend to show deliberate indifference by the City with regard to its *training or supervision*, let alone deliberate indifference that caused Honestie's injury. Thus, Plaintiff's allegations are not sufficient to infer deliberate indifference under the approach requiring a pattern of prior instances of misconduct.

As to the second approach, Plaintiff does not allege facts from which to infer that it would be "so obvious" that a lack of training or a policy regarding interacting with children would create

20

a foreseeable risk of constitutional violations like the one suffered by Honestie.  Indeed, it is not clear what training is necessary with regard to children in particular that would not be satisfied by general training regarding appropriate detentions and uses of force.  The Fourth Amendment rights at issue apply to children in the same manner that they apply to adults.[6]  Plaintiff simply alleges that the City's training and supervision were not "adequate" without providing meaningful specifics from which to infer that the City's failures were closely related to or caused Honestie's constitutional injury.  (*See* Compl. ¶¶ 97, 99, 155.)  Conclusory allegations such as these do not suffice to state a claim.  *Cf. Linden v. City of Southfield*, 75 F.4th 597, 606 (6th Cir. 2023) ("While the Second Amended Complaint asserts that the City provided the First Responders with inadequate training, it marshals no facts to support this bare conclusion.").

Plaintiff argues that the Court should not saddle her with an "unreasonable and unrealistic burden" of alleging facts that, "as a practicable matter," may only be "known, confirmed, and available *after* discovery."  (Pl.'s Resp. 22, ECF No. 19.)  However, there is no relaxed pleading standard for claims based on facts or suspicions that a plaintiff cannot learn or confirm until after discovery.  In all cases, a plaintiff must present a complaint that pleads sufficient factual matter to state a "plausible" claim, rather than a merely "possible" one.  *See Iqbal*, 556 U.S. at 679.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" and "unlock[s] the doors of discovery[.]"  *Id.* at 678-79; *see Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 498 (6th Cir. 2023) ("[F]ederal courts will not 'unlock the doors of discovery' for a fishing expedition based on a plaintiff's speculative assertions." (quoting *Iqbal*, 556 U.S. at 678-79)).

---

[6] Even the City's alleged new policy of using "least restrictive option" when interacting with children is essentially the same as what officers must do for adults during investigative detentions.  *See Binay*, 601 F.3d at 652 (noting that "the Fourth Amendment permits detention using only the least intrusive means reasonably available" (quoting *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002) (quotation marks omitted)).

### 2. Failure to Investigate

Plaintiff alleges that the City did not adequately review and investigate the incident involving Honestie.  (Compl. ¶¶ 96, 158, 165.)  "A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct."  *Wright*, 962 F.3d at 882.  Plaintiff's allegations fall short because such a claim requires "'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances."  *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020) (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)).  Plaintiff has not alleged such a pattern here.  "[A]n allegation of a *single* failure to investigate a single plaintiff's claim does not suffice" because that failure would have occurred *after* the plaintiff's injury and could not have been the cause of that injury.  *See id.*  Likewise, the failure to adequately investigate the incident involving Honestie could not have been the cause of her injury.

For the foregoing reasons, Plaintiff fails to state a claim against the City.  Consequently, the Court will dismiss Counts IV and V.

### D. Count VI: Substantive Due Process

Plaintiff brings a claim under the "substantive" component of the Fourteenth Amendment's Due Process Clause, arguing that Defendants "interfere[d] with Honestie's property and liberty interests which entitle Honestie the right to bodily integrity."  (Compl. ¶ 170.)  Plaintiff also contends that Defendants "have implemented a policy of transforming non-serious and simple law enforcement interactions with youth citizens, especially African American youth citizens into invasive searches and seizures, flouting constitutional requirements related to private property and liberty interests."  (*Id.* ¶ 173.)

Defendants argue that the Court should dismiss the substantive due process claim because it is more appropriately analyzed under the Fourth Amendment.  The Court agrees.

The Supreme Court has supplied the following instruction regarding substantive due process claims:

> [A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Graham v. Connor*, 490 U.S. at 395.

Plaintiff responds that she asserts a claim for deprivation of the right to personal security and bodily integrity that is not covered by her Fourth Amendment claims.  In particular, she claims that Defendants arbitrarily deprived Honestie of her liberty when they pointed handguns at her, put her in handcuffs, and then placed her in a police vehicle.  Plaintiff argues that Defendants' conduct was arbitrary and shocks the conscience, which is the standard for a substantive due process claim.  However, Plaintiff's claims are covered by the Fourth Amendment, which prohibits unreasonable searches and seizures.  The Fourth Amendment also applies to claims that police officers used unnecessary or excessive force in the course of an arrest or detention.  Because the Fourth Amendment applies, the Court uses the standard applicable to the Fourth Amendment instead of the standard for substantive due process.  *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 133 (6th Cir. 2014).  "[T]he 'shocks the conscience' standard is not an exception to the rule that claims must be brought under specific constitutional provisions if one is applicable."  *Davis v. Gallagher*, 951 F.3d 743, 752 (6th Cir. 2020).  Accordingly, the Court will dismiss Plaintiff's substantive due process claim because it is duplicative of her Fourth Amendment claims.  *See id.*

(affirming dismissal of substantive due process claim that was duplicative of another constitutional claim).

### E. Count VII:  Michigan Constitution

Plaintiff also claims that Defendants violated Honestie's rights under the Michigan Constitution to due process and to be free from unreasonable searches and seizures.  As Defendants indicate, there is no damages remedy available against individual government employees or municipalities for violations of the Michigan Constitution.  *See Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 687 (6th Cir. 2018) (citing *Jones v. Powell*, 612 N.W.2d 423, 426 (Mich. 2000)).  Plaintiff concedes this point.  (Pl.'s Resp. 29-30.)  Nevertheless, Plaintiff argues that she is entitled to injunctive or declaratory relief for such violations.

Plaintiff is mistaken.  She lacks standing to seek declaratory or injunctive relief.  Although Defendants did not raise the standing issue in their initial brief, the Court can address the issue because the Court has an independent obligation to ensure that Plaintiff has standing under Article III of the Constitution.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).  "Importantly, plaintiffs must establish standing for each form of relief they seek, and the type of harm alleged impacts the available relief."  *Simpson-Vlach v. Mich. Dep't of Educ.*, No. 22-1724, 2023 WL 3347497, at *4 (6th Cir. May 10, 2023).

The requirements necessary to obtain standing for damages relief are different from those necessary to obtain standing for injunctive or declaratory relief.

> Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief.  This is because the fact that a harm occurred in the past "does nothing to establish a real and immediate threat that" it will occur in the future, as is required for injunctive relief.  Obtaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief.

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983) (internal citation omitted)).  To obtain

standing for declaratory or injunctive relief, Plaintiff "must plead either a future injury that is 'certainly impending' or presents a 'substantial risk' of occurrence, or a past injury that presents 'continuing, present adverse effects[.]'" *Simpson-Vlach*, 2023 WL 3347497, at *4 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019) (internal citations omitted)).

In this case, Honestie is no longer alive.  Consequently, there is no risk that she (or her estate) will suffer any injury in the future from conduct by Defendants.  *See Belevender v. Magi Enters., Inc.*, No. 3:06 CV 1595, 2007 WL 671316, at *4 (N.D. Ohio Feb. 28, 2007) (citing cases with similar circumstances); *see also Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 49 (1st Cir. 2006) (denying injunctive relief because the plaintiff's death "eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm"); *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997) (denying declaratory relief because the plaintiff had died).  Thus, Plaintiff (who represents Honestie's estate) does not have standing to obtain injunctive or declaratory relief for a violation of Honestie's rights.

Because Plaintiff cannot obtain any relief for a violation of the Michigan Constitution, the Court will dismiss Count VII.

### F. Count VIII: Negligence

Plaintiff claims that Defendants were negligent when interacting with Honestie by handcuffing her, pointing firearms at her, detaining her, "[u]sing force" on her, failing to "deescalate the emotional trauma inflicted upon" her, and "[o]therwise failing to execute proper policies, practices and/or procedures that resulted in the infringement" of her "constitutional and federal rights."  (Compl. ¶ 205.)  Plaintiff further contends that Officers Sellner, Barberino, and Dionne "committed acts of gross negligence" that included pointing firearms at Honestie,

25

handcuffing her, and detaining her. (*Id.* ¶ 206.) Defendant responds that Plaintiff's negligence claims are simply an improper attempt to reframe her intentional tort claims. The Court agrees.

"Elements of intentional torts may not be transformed into gross negligence claims." *Norris v. Lincoln Park Police Officers*, 808 N.W.2d 578, 584 (Mich. Ct. App. 2011); *accord Graves v. Hedger*, No. 346257, 2020 WL 6937058, at *6 (Mich. Ct. App. Nov. 24, 2020). The Court is not bound by the label a party chooses to apply to their claim. *Id.* at 582. Rather, the Court looks to "the gravamen of plaintiff's action . . . by considering the entire claim." *Latits v. Phillips*, 826 N.W.2d 190, 197 (Mich. Ct. App. 2012) (quoting *Maiden v. Rozwood*, 597 N.W.2d 817, 830 (Mich. 1999)).

Here, the gravamen of Plaintiff's negligence claims is intentional torts, i.e., intentional conduct by Defendants in detaining and restraining Honestie. Her negligence claims are based on the same facts as her intentional tort claims for assault, battery, and false imprisonment in Counts IX and X, and the alleged harm stems from intentional conduct by Defendants, not negligent conduct. Even Plaintiff acknowledges that her "negligence count is an alternative pleading to the assault and battery claim[.]" (Pl.'s Resp. 32.) Nevertheless, she argues that Defendants Sellner, Barberino, and Dionne exhibited a "willful disregard of precautions or measures to attend to safety and substantial risks." (*Id.* at 33.) It is not clear what she means by this. Nothing in the complaint suggests that Defendants injured Honestie by putting her safety at risk. Accordingly, Plaintiff's negligence claims are more properly characterized as intentional tort claims for assault, battery, and/or false imprisonment. Because Plaintiff raises these intentional tort claims elsewhere, the Court will dismiss the negligence claims in Count VIII. *See Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) (dismissing gross negligence claim that was "fully premised [on a] claim of

excessive force" because "[t]he only cause of action available to plaintiff for allegations of this nature would be for assault and battery").

### G. Counts IX & X: Assault, Battery, False Imprisonment

Defendants argue that Plaintiff's claims for assault, battery, and false imprisonment are barred by the 2-year statute of limitations in Mich. Comp. Laws § 600.5805(3),[7] which expired on December 6, 2019.  Plaintiff filed her complaint on November 22, 2023.  Because Honestie was a minor when her claim accrued, Michigan law allowed her estate to file a claim within one year of her death:

> Except as otherwise provided . . . if the person first entitled to make an entry or bring an action under this act is under 18 years of age . . . at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run.  This section does not lessen the time provided for in section 5852.

Mich. Comp. Laws § 600.5851(1).

Plaintiff alleges that Honestie died at the age of 14 on November 22, 2020.  (Compl. ¶ 12.) Thus, under § 600.5851(1), her estate had until November 22, 2021, to bring a complaint.  Plaintiff did not file the complaint within that time period.

The foregoing section is subject to Mich. Comp. Laws § 600.5852, which provides in pertinent part:

> (1) If a person dies before the period of limitations has run or within 30 days after the period of limitations has run, an action that survives by law may be commenced by the personal representative of the deceased person at any time within 2 years after letters of authority are issued although the period of limitations has run.
>
> . . .

---

[7] Mich. Comp. Laws § 600.5805(3) provides that "the period of limitations is 2 years for an action charging assault, battery, or false imprisonment."  *Id.*

(4) Notwithstanding subsections (1) to (3), an action shall not be commenced under this section later than 3 years after the period of limitations has run.

Mich. Comp. Laws § 600.5852.

Plaintiff argues that § 600.5851 tolled the limitations period until Honestie's death, meaning that Honestie died before the statute of limitations expired.  Thus, Plaintiff argues that § 600.5852(1) allows Honestie's estate to bring suit within 2 years after receiving letters of authority.  Plaintiff contends that she received those letters of authority when she was appointed as the personal representative of Honestie's estate on November 22, 2022.

Plaintiff is mistaken.  The two-year statute of limitations in § 600.5805(3) expired in December 2019.  The savings provision for minors in § 600.5851 is an exception to the statute of limitations; it "does not toll the running of the general period of limitations applicable to the action[.]"  *Vance v. Henry Ford Health Sys.*, 726 N.W.2d 78, 81 (Mich. Ct. App. 2006).  Thus, § 600.5852(1) does not apply because Honestie died in November 2020, more than 30 days *after* the applicable limitations period had run.

Furthermore, even when § 600.5852(1) applies, § 600.5852(4) permits an estate to bring a claim no later than three years after the underlying period of limitations has run.  *See Farley v. Advanced Cardiovascular Health Specialists PC*, 703 N.W.2d 115, 119 n.16 (Mich. Ct. App. 2005) ("[T]he three-year ceiling limits the two-year saving period to those cases brought within three years of when the [tort] limitations period expired.").  Section 600.5852 is also an exception to the underlying statute of limitations for tort claims; it is not a separate statute of limitations.  *See Waltz v. Wyse*, 677 N.W.2d 813, 818 (Mich. 2004).  Plaintiff filed suit more than three years after December 6, 2019, when the statute of limitations in § 600.5805 expired; thus, her claims are untimely even under the savings provision in Mich. Comp. Laws § 600.5852.  Accordingly, the Court will dismiss the claims in Counts IX and X because they are untimely.

### IV. CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion to dismiss in part and deny it in part.  The Court will dismiss all claims other than those in Counts I-III of the complaint.  The Court will also dismiss the claims against Defendants Sellner, Barberino, and Dionne in their official capacities.  Because there is no claim remaining against the City after dismissal of the foregoing, the Court will dismiss the City as a defendant.

The claims remaining are the Fourth Amendment claims in Counts I-III against Defendants Sellner, Barberino, and Dionne in their individual capacities.

The Court will enter an order consistent with this Opinion.


Dated: June 18, 2024                              /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE